Filed 1/10/23 P. v. Barbarin CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E079085 |
| v. | (Super.Ct.No. RIF1407905) |
| MICHAEL ANTHONY BARBARIN II, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Mac R. Fisher, Judge. Affirmed.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

1

## STATEMENT OF THE CASE

On May 20, 2016, an information charged defendant and appellant Michael Anthony Barbarin, Jr., and codefendant Anthony Valadez with one count of murder under Penal Code[1] section 187, subdivision (a) (count 1). The information also alleged that (1) defendants committed the crime for the benefit of, at the direction of, or in association with a criminal street gang; (2) defendants were principals and that at least one principal discharged a firearm causing death under section 12022.53, subdivisions (d), and (e); (3) the murder was carried out to further the activities of a criminal street gang under section 190.2, subdivision (a)(22); and (4) the victim was killed on the basis of his race, color, religion, nationality or country of origin under section 190.2, subdivision (a)(16).

On February 13, 2020, a jury convicted defendant of first degree murder under sections 187, subdivision (a), and 189, subdivision (a). The jury also found true the gang enhancement allegation under section 186.22, subdivision (b)(1)(C); the firearm enhancement allegation under section 12022.53, subdivisions (d) and (3); and the gang murder special circumstance allegation under section 190.2, subdivision (a)(22). The trial court dismissed the special circumstance allegation that the victim was killed on the basis of his race under section 190.2, subdivision (a)(16), per the prosecution's motion.

---

[1] All further statutory references are to the Penal Code unless otherwise specified

On September 4, 2020, the trial court sentenced defendant to a term of life without the possibility of parole, plus an additional 25 years to life, and awarded defendant presentence custody credit.

After defendant appealed, on December 20, 2021, we issued an unpublished opinion in *People v. Barbarin* (Dec. 20, 2021, E075678) [nonpub. opn.].) In the opinion, we reversed the gang-murder special circumstances finding under section 190.2, subdivision (a)(22), the gang enhancement under section 186.22, subdivision (b)(1)(C), and the firearm enhancement under section 12022.53, subdivisions (d) and (e). We also reversed defendant's sentence and directed the lower court to resentence defendant.

On May 23, 2022, the trial court resentenced defendant to 25 years to life in state prison. The court also awarded defendant 2,645 days credit for actual time served.

On May 27, 2022, defendant filed a timely notice of appeal.

On September 19, 2022, defendant filed his opening brief, and the People filed the respondent's brief on October 8, 2022. On October 27, 2022, defendant filed a "request to strike his opening brief and replace it with a brief pursuant to *Wende* and *Anders*." On November 1, 2022, we granted defendant's request and directed the clerk of this court to strike the filing of both defendant's opening brief and the respondent's brief.

In the interim, on October 7, 2022, we granted defendant's request for judicial notice filed on September 19, 2022, and directed the clerk of this court to place the record in the underlying case with the record in this case.

# FACTUAL HISTORY[2]

"Eastside Riva (ESR) is a Hispanic gang that claims territory in the eastern end of the City of Riverside. ESR is an 'umbrella gang.' Within ESR there are subgroups known as cliques. The structure is similar to 'a business corporation that has subsidiaries.' On the southern side of ESR territory, near Lincoln Park, the three ESR cliques that spend time together are 14th Street, Los Romanos, and Defiantes.

"Graffiti identified defendant's older half-brother, Anthony Valadez (Brother), as a member of the 14th Street clique. Graffiti identified defendant as a member of the 14th Street clique. A jail kite/note also identified defendant as a member of the 14th Street clique. A tattoo on defendant's hand identified him as a member of the 14th Street clique.

"Another gang on the eastern end of the City of Riverside is the 1200 Blocc Crips, which is an African American gang. ESR and the 1200 Blocc Crips are rivals. Dana Parker (the victim) was a former member of the 1200 Blocc Crips. The victim had been active in the 1200 Blocc Crips when he was in his 20s; the victim was 40 years old when he was killed.

"On the afternoon of May 31, 2014, the victim was sitting in his car outside his grandmother's apartment complex, which was in a neighborhood that 1200 Blocc Crips sometimes visited. At approximately 3:40 p.m., a green Ford Explorer with two people inside stopped next to the victim's car. The victim was shot four times with nine-

---

[2] The factual history is taken from our opinion in *People v. Barbarin*, *supra*, E075678.

4

millimeter bullets. The Ford Explorer sped away. The victim died within minutes as a result of internal bleeding from the gunshot wounds. The four shell casings left at the scene read 'PPU 9mm Luger.'

"On June 5, 2014, police conducted a traffic stop on the Ford Explorer, in the eastern end of Riverside. Brother was the sole occupant of the Explorer. Brother was arrested for being under the influence of a controlled substance. Upon searching the vehicle, officers found a fully loaded nine-millimeter Hi-Point handgun under the dashboard of the Explorer, on the driver's side. Officers also found two live nine-millimeter rounds inside a sock wedged between the center console and the front passenger seat. The rounds in the sock and the rounds in the gun were stamped with 'PPU 9mm Luger.' Gunshot residue was not taken from the Ford Explorer. DNA on the butt of the handgun matched Brother's DNA. DNA swabs were also taken from the gun's handle, trigger, and magazine. DNA tests indicated there were multiple people who handled the other parts of the gun, but there was insufficient DNA to match it to specific people.

"On January 27, 2015, Detectives Brandt and Simon interviewed defendant about the May 2014 homicide. The interview took place in an interview room at the Riverside County jail. Defendant had been arrested on July 15, 2014, for an unrelated carjacking.

"Brandt told defendant that Brother was in custody for a homicide that occurred in May 2014 and that Brother admitted to driving the car that the killer was in. Brandt said Brother alluded to defendant having been in the Explorer with Brother during the murder but Brother 'didn't get much more into it.' Brandt said Brother's 'attorney has approached the DA's office.' Brandt asked defendant what Brother might say to the district attorney if the district attorney agreed to meet with him. Defendant said he did not know.

"Brandt responded, 'I have a feeling he is gonna tell us that you were there, and I'm gonna give you the shot to give your side of it up. I mean, if it's gonna be one of those things, like, he says you did it, and you said he did it, whatever, that's fine. I mean, but if he—if he's gonna tell us that and that's the truth, (unintelligible) for him to, ya know, potentially, go away forever. Um, I don't know if you feel the same way about that, or not. Um, if you were involved in that would you—would you tell us?' Defendant responded, 'I would but (unintelligible).'

"Defendant explained that he is 'always with [Brother].' Brandt said, 'I know that too, and I know that—that you coulda, like, I'm pretty certain that you were at least with [Brother]. And maybe with [Brother] to encourage him—to give him, uh, give him a little courage to go (unintelligible) or whatever . . . somethin' had to be up for [Brother] to do just roll up and do this broad daylight, or whatever. (Unintelligible) fucking cried, and it—that's just, like, not normal. That's not normal—that's, like, somethin'— something's up, so I don't believe he shot and I don't wanna see him go to jail for, like, life in prison, like, without parole, probably, um, for something that he was just drivin'.'

6

Defendant responded, 'Mm-hm.' Brandt said, 'We found the gun in his car. We found the car—everything. Told us he was driving, um, but I think it's fucked up that he go away forever.' Defendant's response was unintelligible on the recording.

"As the interview continued, Brandt asked defendant what would happen to Brother if Brother made a deal with the prosecutor. Defendant's response was unintelligible on the recording. Then the following exchange occurred:

" 'Brandt: Not gonna be good, I mean, he's gonna lose the family respect. He's gonna lose your respect. He's gonna lose respect anywhere. So I don't know if he wants to do that. I think it's probably a pretty hard decision he's gonna have to make at some point. And I don't know if it's being encouraged by his attorney, or if he's trying to do it, or whatever, but, they'll come to the DA's office, and at this point, ah, I'm gonna say, okay, yeah, let's—let's talk to him—see what he has to say. Which, means what? Means he's gonna be a snitch.

" '[Defendant]: (Unintelligible).

" 'Brandt: Right, so whether it's on you, or whether it's on one of his pretty boy friends, or whatever, (unintelligible) gonna pick on somebody. I'm telling (unintelligible). So if you know he didn't do it, I want you to tell me what you know.

" '[Defendant]: He didn't do it.

" 'Brandt: 'Kay, and tell me why you know that.

" '[Defendant]: I did.

" 'Brandt: You did it?

" '[Defendant]: Yeah.'

7

"Defendant said Brother believed he was dropping defendant off at defendant's girlfriend's house, and Brother was unaware that defendant had a gun. Brandt asked for details about the killing that would not have 'been released in the newspaper.' Defendant responded, 'No, I'm tryin' to tell ya, but then, see I don't want him to [be] labeled as a snitch. You know, that's, like, one thing I don't want.' Brandt responded, 'Okay, well, the only way that—that could happen, is if you tell us, and then I can prove that you did it. You know what I'm saying? So I need you—I need you to, like, go over the details. Not just, like, like, I got a car, I rolled up and shot him point blank, I mean, all that shit is true, but more went into it th[a]n—th[a]n just that.'

"Defendant explained that he saw the victim in the victim's car. Brother drove past the victim, and then turned around and came back to where the victim's car was parked. Defendant told Brother to stop the car. Brother stopped the car in the roadway. Defendant walked up to the victim, did not speak to him, and shot him. Defendant returned to the car, and Brother took the gun from defendant. Defendant explained to the detectives that he lied to Brother about having a girlfriend in the area, and that defendant's actual purpose for the trip was 'huntin[g].' 'Hunting' means searching for a rival gang member upon whom to commit a violent crime.

"The following exchange occurred:

" 'Brandt: So and you['re] being honest with us—[Brother] ha[d] no idea you were gonna do this?

" '[Defendant]: (Unintelligible).

" 'Brandt: You're not covering for him?

8

" '[Defendant]: No.

" 'Brandt: You're not tryin' to take the [rap].

" '[Defendant]: Mm-mm.

" 'Brandt: Are you being honest that you're the one that shot?

" '[Defendant]: Yeah.

" 'Brandt: You swear on your grandma's life—you're the one that shot?

" '[Defendant]: (Unintelligible).

" 'Brandt: You're tellin' us the truth?

" '[Defendant]: Yes, like, like, every day, like, I just feel like shit (unintelligible).

" 'Brandt: 'Cause I—you have to understand, like, we're not out to just arrest anybody.

" '[Defendant]: Oh, I know that.

" 'Brandt: We wanna make sure that we hold the person responsible for what they did. Y-you—you're telling us that [Brother] didn't do it, ya know, that's, uh, th- that's important.

" '[Defendant]: Yeah, he didn't do it. Why would I risk my life (unintelligible)?

" 'Brandt: Right.

" '[Defendant] Why would I risk . . .

" 'Brandt: No . . .

9

" '[Defendant]: Why would I risk my life, just to try to get him out?'

"Brandt asked if defendant spoke with Brother about the murder after it occurred. Defendant said he spoke with Brother in the dayroom in the jail, but then denied having spoken with Brother. Simon, the other detective, said, 'You telling us the truth right now? You're not trying to take one for your brother, just to take one for your brother?' Defendant replied, 'I don't know.' "

## DISCUSSION

After defendant appealed, and upon his request, this court appointed counsel to represent him. Counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 and *Anders v. California* (1967) 386 U.S. 738 setting forth a statement of the case, a summary of the facts, and potential arguable issues, and has requested this court to undertake a review of the entire record. Pursuant to *Anders*, counsel identified the following issue to assist the court in its search of the record for error: "Whether the trial court abused its discretion by denying[defendant]'s request for probation?"

We offered defendant an opportunity to file a personal supplemental brief, and he has not done so.

Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the record for potential error. We are satisfied that defendant's attorney has fully complied with the responsibilities of counsel and no arguable issue exists. (*Id.* at p. 126; *People v. Wende*, *supra*, 25 Cal.3d at pp. 441-442.)

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                                                                        J.


We concur:


RAMIREZ _____
                        P. J.


FIELDS _____
                        J.